639 So.2d 135 (1994)
Barry A. OWNBY, Petitioner,
v.
Marina L. OWNBY, Respondent.
No. 93-2776.
District Court of Appeal of Florida, Fifth District.
July 1, 1994.
*136 Roger L. Berry, New Smyrna Beach, and Calvin J. Faucett, Orlando, for petitioner.
Philip B. Peterson, New Smyrna Beach, and C. Michael Barnette, Daytona Beach, for respondent.
DIAMANTIS, Judge.
Barry A. Ownby, the husband in a dissolution of marriage action, seeks certiorari review of a circuit court order which compels him to comply with a stipulation in which he agreed to submit to a Human Leukocyte Antigen (HLA) blood test. We grant the petition because the trial court's order departs from the essential requirements of law and will cause material injury which cannot be remedied by a plenary appeal.
The husband brought a dissolution of marriage action against his wife, Marina L. Ownby. The parties have six children who range in age from two to sixteen. The husband is seeking custody of all six children, while the wife is seeking custody of the youngest five children. The husband contends that he is the biological father of all of the children, including Barry, the youngest child, while the wife maintains that the husband is not the biological father of Barry. The husband further contends that, even if he is not the biological father of Barry, he is the legal father of the child because the parties considered him to be the child's father, he has provided care and support for the child, his name appears on the original birth certificate as the child's father, he has been responsible for and has paid the medical expenses of the child, including the birthing expenses, and he was present during the delivery of the child and assisted in the child's birth. The wife does not name the alleged putative father, nor does the record before us indicate the name of any alleged putative father or whether he has shown any interest in the child. Both parties in their verified petitions state, in compliance with the Uniform Child Custody Jurisdiction Act,[1] that they have no information of any custody proceeding pending *137 in a court of this or any state concerning these children and that they do not know of any other person not a party to these proceedings who has, or claims to have, physical custody or visitation rights with respect to the children.
The matter, by order of the trial court, went to mediation. During mediation proceedings, the parties, both of whom were represented by counsel, entered into an agreed interim mediation order which provided that the "parties stipulate to HLA Blood Test regarding paternity of Barry."
The husband later refused to undergo HLA testing and, as a result, the wife filed a motion with the trial court seeking an order directing the husband to comply with the mediation agreement. The husband's answer to the wife's motion stated that: (1) he was erroneously informed by the mediator that he had no choice but to submit to HLA testing; (2) he was not advised that Department of Health & Rehabilitative Services v. Privette, 617 So.2d 305 (Fla. 1993), requires that certain enumerated procedures, which are intended to protect the rights of the child and the putative father, be followed before ordering a paternity test; and (3) the best interests of the child would be better served if his paternity remained "uncontroverted."
The trial court rejected these arguments and entered an order directing the husband to undergo the testing. It is this order that the husband challenges in his petition for writ of certiorari. In his petition, the husband also contends that the parties' stipulation for the HLA testing is void on public policy grounds.
The husband's contention that the trial court's order must be vacated because the mediator either coerced or misled him into executing the stipulation is without merit because the husband has not furnished us with a transcript of the proceedings before the trial court demonstrating that any evidence was presented to support this contention. We note that the husband has not filed any pleading seeking to revoke the stipulation. We also conclude that the stipulation in and of itself does not violate public policy because the parties, as between themselves, can agree to undergo blood testing.
It was improper, however, for the trial court to order the husband to undergo HLA testing without first complying with the mandate set forth in Privette. In Privette, our supreme court forcefully set forth the strict procedural requirements and findings which must be made before HLA testing can be permitted:
Once children are born legitimate, they have a right to maintain that status both factually and legally if doing so is in their best interests. The child's legally recognized father likewise has an unmistakable interest in maintaining the relationship with his child unimpugned, such that his opposition to the blood test and reasons for so objecting would be relevant evidence in determining the child's best interests.
* * * * * *
... The trial court hearing a petition for a blood test is required: (a) to determine that the complaint is apparently accurate factually, is brought in good faith, and is likely to be supported by reliable evidence, and (b) to find that the child's best interests will be better served even if the blood test later proves the child's factual illegitimacy. The one seeking the test bears the burden of proving these elements by clear and convincing evidence.
While this burden is substantially greater than would apply in any other discovery context, we believe it is absolutely mandated by the presumption of legitimacy and the policies on which it rests. Court after court in the United States has held that the presumption and its related policies are so weighty that they can defeat even the claim of a man proven beyond all doubt to be the biological father.
The New York intermediate appellate court in [State ex rel. H. v. P., 90 A.D.2d 434, 437, 457 N.Y.S.2d 488, 491 (1982)] has stated that, while the presumption of legitimacy is rebuttable, it will not fail unless common sense and reason are outraged by applying it to the case at hand. We take this to mean that there must be a clear and compelling reason based primarily on the child's best interests to overcome the *138 presumption of legitimacy even after the legal father is proven not to be the biological father. This is at least the equivalent of the burden of proof that would exist in proceedings to terminate the legal father's parental rights.
* * * * * *
... It is conceivable that a man who has established a loving, caring relationship of some years' duration with his legal child later will prove not to be the biological father. Where this is so, it seldom will be in the children's best interests to wrench them away from their legal fathers and judicially declare that they now must regard strangers as their fathers. The law does not require such cruelty toward children.
All of this has important consequences in deciding whether a blood test will be permitted in the first instance. If the record shows there is no possibility the presumption of legitimacy can be overcome by the blood test result (whatever it might be), then the test will serve no purpose at all. If there is no purpose, the petition should be denied. The child should not risk being stigmatized without reason. Thus, in a real sense, the trial court ordering the blood test must decide one of the ultimate issues: whether the child's best interests will be served by being declared illegitimate and having parental rights transferred to the biological father.
Privette, 617 So.2d at 307-09 (citations and footnotes omitted) (emphasis in original).
Based upon the decision in Privette, we grant certiorari, quash the order compelling the husband to submit to HLA testing, and remand this cause to the trial court for further proceedings.[2]
On remand, the trial court must appoint a guardian ad litem to represent the child. The trial court then shall conduct a hearing to determine if the wife can demonstrate, by clear and convincing evidence, that her allegation concerning the illegitimacy of the child is apparently accurate factually, made in good faith, and likely to be supported by reliable evidence. The wife also must establish that the child's best interests will be served by permitting the HLA testing even if the testing later proves the child's factual illegitimacy. Because of the importance of the issue of legitimacy to the child, the husband should be heard regarding these elements, as should the child's guardian ad litem and the putative father.[3]
WRIT GRANTED; ORDER QUASHED.
PETERSON, J., concurs.
GRIFFIN, J., concurs in part; dissents in part, with opinion.
*139 GRIFFIN, Judge, concurring in part; dissenting in part.
There is a real risk of overbroadly applying the holding of the Privette decision in family contexts that differ so profoundly from what the supreme court was addressing in Privette. Privette involved an action by HRS to establish a third party's paternity to a child born in wedlock for purposes of collecting support under circumstances where neither the legal father's interests nor the child's interests were represented.[1] The third party putative father objected, based, inter alia, on his privacy rights. As the Second District court had said in Privette, because such testing is "intrusive and highly personal," objecting strangers have a privacy right entitled to consideration. Privette v. Department of Health & Rehab. Services, 585 So.2d 364, 366 (Fla. 2d DCA 1991). The supreme court took steps to protect that right in establishing its two-prong test.
In this case, there is no stranger objecting to an invasion of his privacy rights. This is the child's legal father, who claims paternity and who has entered into a binding agreement for the blood test. If decided in the context of a case such as the present one, the first prong of the Privette court's two-prong test might be very different or, more likely, would be missing entirely. Its evident purpose  to protect the privacy rights of a stranger of whom a blood test is demanded based on allegations that he engaged in a meretricious relationship with a woman married to someone else  simply has no relevancy in this type of case.
Even if the first prong is applicable, however, I disagree with the majority's decision to put respondent to the proof of it. It is clear that petitioner entered into a written contract after mediation in which he agreed to take the blood test. As the majority notes, the agreement is valid and the first prong is fully satisfied.
I do agree that the court must appoint a guardian ad litem for the child and must carefully follow the Privette court's instructions concerning whether it is in the child's best interests to determine whether his legal father is his natural father.
I disagree, however, with the majority's gratuitous decision that the as yet unidentified putative father should be joined as a party. Unlike the legal father whose right to be heard was recognized in Privette, the other potential father candidates are utterly irrelevant to this dissolution proceeding. Under Florida law, this father's rights are wholly unrelated to and certainly not dependent on the willingness of the natural father to assume parental responsibilities. The only relevant issue in the dissolution is whether it is in the best interests of the child that it be known whether the legal father is the natural father because if it is discovered that he is not the natural father, his rights and obligations in the dissolution are radically altered. Meeks v. Garner, 598 So.2d 261 (Fla. 1st DCA 1992); Swain v. Swain, 567 So.2d 1058 (Fla. 5th DCA 1990).
The majority holds that "before the court can find that HLA testing is not in the best interests of the child, the trial court must consider the ability and willingness of the putative father to assume parental responsibilities in the event he is found to be the biological father." Why would this be so? And how could it possibly work? It cannot possibly be true that a man who has been a loving and supportive parent for years will be less likely to be allowed visitation because some "putative" father is more able or is also willing to assume parental responsibilities. Nor should he be more likely to be permitted visitation because one or more of the candidates for natural father is a bad person.
I suggest that, although the identity and fitness of any "putative father" may be relevant on the "best interests" issue in a paternity case, the focus of the "best interests" test in a dissolution should be the family itself. To have the candidates for putative father be made parties to this divorce will necessarily result in truly surreal proceedings below. Will the mother be expected to name all the possible alternate candidates for *140 the biological father? What is the penalty if she refuses? When these putative fathers are identified, who must add them as parties? Will each one really be examined to see whether he could and would be a better father in the event the mother ever elects to commence paternity proceedings against him and subsequent testing establishes one of them to be the father? It would be better in this dissolution simply to look at this family  mother, legal father and child  and decide whether, on balance, it is best that this legal father's rights be subject to limitation because he is not a natural parent.
NOTES
[1] §§ 61.1302-1348, Fla. Stat. (1993).
[2] We reject the wife's contention that the husband formally must raise an estoppel defense to the wife's claim that he is not the natural father in order to contest the stipulated HLA blood test because "the presumption of legitimacy is based on the policy of protecting the welfare of the child, i.e., the policy of advancing the best interests of the child," and "[t]his policy is a guiding principle that must inform every action of the courts in this sensitive legal area." Privette, 617 So.2d at 307. We question whether the wife or the husband, even if so inclined, could expressly or impliedly waive the right of the child to maintain his legitimacy. See Sacks v. Sacks, 267 So.2d 73, 76 (Fla. 1972). See also Gammon v. Cobb, 335 So.2d 261, 266 (Fla. 1976). We point out that the husband only stipulated to undergo HLA testing; he did not agree to terminate his parental rights.
[3] The putative father should be joined as a party because, before the trial court can find that HLA testing is in the best interests of the child, the trial court must consider the ability and willingness of the putative father to assume parental responsibilities in the event he is found to be the child's biological father. Absent such consideration, we fail to see how permitting HLA testing could serve the child's best interests because, to permit such testing in a situation where the putative father would be unwilling or unable to parent, would result, at best, in the husband having to support the child with a declaration of illegitimacy or, at worst, in the child not receiving support from either his legal or biological father. The reason that Florida's courts have recognized a strong presumption of legitimacy when the child is either born or conceived during wedlock is to protect the child's welfare and the child's right to receive support. See Gammon v. Cobb, 335 So.2d 261, 266-67 (Fla. 1976); Sacks v. Sacks, 267 So.2d 73, 75-76 (Fla. 1972). We note that, although Gammon is a paternity case, the court in Gammon cites to and quotes from Sacks, a divorce case, because "[a]lthough the factual situation in Sacks, supra, is distinguishable, the principle espoused therein ... is applicable." Gammon, 335 So.2d at 266.
[1] As the Privette court put it: "This is a case about impugning the legitimacy of a child for the sake of money allegedly owed to the state of Florida." Department of Health & Rehab. Services v. Privette, 617 So.2d 305 (Fla. 1993).